# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

|  |  |  |
|---|---|---|
| CONSTANCE HARPER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:14-cv-00658-NKL |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff Constance Harper appeals the Commissioner of Social Security's final decision denying her application for disability insurance benefits. The decision is affirmed.

## I.    Background

### A.  Work history

Harper was born in 1954 and has a high school education. The vocationally-relevant years for purposes of her application are April 1998 to April 2013. Except for 2001, Harper's work history reflects substantial gainful activity every year from 1998 to when she stopped working in March 2011.

Specifically, Harper worked as a Building Permit Tech for the City of Lenexa from August 1984 to January 2000, a position including in-office clerical and administrative responsibilities such as scheduling inspections, doing paperwork and filing, and answering general questions from the public. She also worked as a Building

Permit Tech for the City of North Platte from April 2002 to May 2005. There, she reviewed plans and issued permits, and went into the field by car to do residential inspections.

From November 2005 to May 2006, Harper worked for the City of Fairway, Kansas as an office clerk for the "Police Building/Court Office." [Tr. 27.] The job included data entry, working at the front desk to collect money for traffic tickets and dog licenses, making daily reports of collections, and working with new inspectors. Harper also worked part-time in 2006 as a hostess at an Olive Garden restaurant.

At the end of 2006, Harper went to work as a "nanny-house manager" for a family with three children, ages six months to four years old, 50-55 hours per week (five days per week, ten to eleven hours per day). [*Id.*] Harper left the job in July 2010 to work for a family with two small children, 25 hours per week (five days per week, five hours per day). Her last day of substantial gainful activity was March 25, 2011, when she quit the second nanny job in March 2011 to have surgery for breast cancer.

When Harper filed her application for benefits on January 31, 2011, she alleged disability beginning January 1, 2004, based on vision issues and peripheral neuropathy. At her hearing in January 2013, she amended the alleged onset disability date to July 1, 2010, and claimed disability due to vision problems; breast cancer; diabetes; neuropathy; diarrhea; pain in her limbs, neck and lower back; depression; and side effects of medications.

### B. Medical record

#### 1. Vision

Harper had laser eye surgery in 2003, which made her left eye worse. She was diagnosed with bilateral diabetic retinopathy in 2006 and her left eye was treated for cystoid macular edema with a steroid injection. In April 2007, Harper had 20/300 corrected vision in the left eye and 20/20 in the right. In 2011, Harper underwent a cosmetic blepharoplasty. [Tr. 898.] At the end of 2012, Harper had 20/200 corrected vision in the left eye and 20/40 in the right. A consultative ophthalmologic examination, performed in early 2013 at the request of the ALJ, showed 20/400 corrected vision in the left eye and 20/40 corrected vision in the right eye. The consultant's impression was bilateral diabetic retinopathy, related to type 2 diabetes.

#### 2. Breast cancer

Harper had a left total mastectomy and sentinel node biopsy in March 2011. At an April 2011 follow up, review of her symptoms was negative except for report of pain at a level of 2 out of 10 at the surgical site. At a May 2011 follow up, Harper declined chemotherapy, and began anti-hormonal therapy. She had reconstructive surgery in June 2011. At an August 2011 follow up, she had mild generalized weakness, and mild dry heaves and gagging. Her pain rating was zero and her Eastern Cooperative Oncology Group (ECOG) status was "0, fully active, able to carry on all pre-disease performance without restriction." [Tr. 18.] At a September 2011 follow up, Harper complained of left side chest soreness. In October 2011, there was no evidence of recurrence. She complained of pain rated at the level of 4. The physician noted her status was "fully

3

active, able to carry on all pre-disease performance without restriction." [*Id.*] At a March 2012 doctor visit, Harper was noted to be "doing well." [*Id.*] A physical exam showed she had normal upper and lower extremity strength; and her neurological exam was grossly intact. In April 2012, Harper found a mass in her right breast; a biopsy was negative. At August and October 2012 follow ups, Harper's pain rating was zero and ECOG status was "fully active, able to carry on all pre-disease performance without restriction." [*Id.*]

### 3. Type 2 diabetes

Harper had gastric bypass surgery in 2004 to help address her type 2 diabetes, and lost 100 pounds. In November 2012, Harper's primary care physician, Danielle Stebbins, M.D., noted Harper's diet and compliance were good most of the time, she had sporadic home glucose monitoring, she had had no hypoglycemic reactions, and her diabetes was under good control.

### 4. Neuropathy, carpal tunnel syndrome, and other complaints of pain

Harper was examined by Dr. Stebbins in October 2009 and had no complaints of neuropathy. At a February 2011 visit with Dr. Stebbins, Harper complained of a 10-year history of leg neuropathy, and the recent development of neuropathy in her arms. Harper told the doctor she was unable to feel heat, tripped when walking, dropped things she was holding, and had some weakness and numbness. The doctor assessed peripheral neuropathy, with sensation impaired below the knees and elbows bilaterally.

Harper was referred to Mamatha Pasnoor, M.D. and had a nerve conduction study in November 2011 to evaluate possible neuropathy. The results were normal. At a

4

follow up with Dr. Pasnoor in October 2012, Harper complained of an increased burning sensation in her right thigh. A skin biopsy performed on the right leg suggested small fiber neuropathy. Dr. Pasnoor's assessment was painful diabetic peripheral neuropathy, presently stable on pain medications, and bilateral meralgia parasthetica. Under "Plan," the doctor included continuing to do exercise. [Tr. 947.] The doctor also noted having talked to Harper about participating in an exercise study, but that "[Harper] takes care of her grandchildren during the day and therefore will have difficulty coming in for the visits." [*Id.*] The doctor instructed Harper to return in six months or sooner if symptoms progressed.

Harper saw Steven Bormann, M.D., for a cardiology follow up in March 2012. The physical assessment included examination of Harper's upper and lower extremities, which the doctor noted had "normal strength, alignment and mobility, [and] no deformity." [Tr. 933.] Harper's neurological assessment was noted as "grossly intact." [*Id.*] The doctor noted Harper was "doing well." [*Id.*]

In June 2012, Harper, who is right handed, saw a surgeon, Bruce Toby, M.D., about carpal tunnel syndrome. She reported having had surgery for carpal tunnel syndrome on the right side five years earlier, with good results, and that she had been having symptoms on the left side for a year. Electrodiagnostic studies were performed and Dr. Toby diagnosed left-hand carpal tunnel syndrome. Harper underwent a left endoscopic carpal tunnel release. At an August 2012 follow-up, she reported that her symptoms were completely resolved. Dr. Toby noted on physical examination that her incisions were healing well.

5

The medical record also showed Harper was treated after two accidents in 2010. In March 2010, Harper had a car accident and sustained whiplash, for which she received chiropractic treatment. In May 2010, she fell when she was getting out of a truck, and went to the emergency room with complaints of abdominal injury and severe pain including lower back pain. Her x-rays and a CT scan showed no acute abnormalities, except a hemangioma. She had some chiropractic treatments.

A May 2011 bone scan, related to Harper's breast cancer treatment, showed severe osteopenia, placing Harper at moderate to high risk for fracture. Exercise and Vitamin D and calcium supplements were recommended.

In January 2013, Harper complained to Dr. Stebbins of neck pain, relating it to the March 2010 accident. An x-ray was normal and the doctor concluded Harper likely had a muscular issue.

### 5. Depression

In February 2011, Dr. Stebbins reviewed Harper's medical history and examined her. Dr. Stebbins' assessment was peripheral neuropathy, abnormal mammogram, uncontrolled type 2 diabetes, and B12 deficiency. In March 2011, Harper reported to Dr. Stebbins that she was recently diagnosed with breast cancer and was depressed, anxious, and not sleeping well. Dr. Stebbins' assessment included depression. At a July 2011 visit, Harper reported being depressed and crying daily with insomnia. The doctor adjusted Harper's medications for depression and sleep. In August 2011, Harper reported sleeping better, but that she was still fatigued during the day. She also reported memory problems, and difficulty spelling and retrieving words. The doctor opined that the

symptoms were likely due to stress and depression.

In April 2012, Harper told Dr. Stebbins her depression was not controlled on her current medication. At a visit in May 2012, Harper complained of shortness of breath, back pain, and sleeping 12 hours a day due to pain medication, but not depression. In November 2012, Harper told Dr. Stebbins that her depression was not well controlled, as she had low energy and was still sleeping 12 hours a day.

But at Harper's follow up visits at the cancer clinic in January, April, July, and August 2012, Harper was examined and, under "Psychiatric," noted to have normal mood, affect and behavior, and did not complain of depression. [Tr. 853, 862, 870, and 884.]

### 6. Gastrointestinal complaints

At an April 2011 oncology visit after Harper's mastectomy, review of systems was negative for gastrointestinal problems. Harper began antihormonal therapy in May 2011. At an August 2011 follow up, she reported dry heaves and gagging. She was tried on a different antihormonal drug, and then switched to Tamoxifen in November 2011, which she stopped taking shortly thereafter. At a December 2011 visit with an internist, Aravind Sugumar, M.D., Harper reported that her episodes of nausea and vomiting had decreased since stopping her breast cancer mediations, but she reported having diarrhea several times per day. Her physical exam was normal. [Tr. 710.] At an April 2012 oncology follow up, she reported that she had stopped taking the Tamoxifen because it caused "swell[ing]" and "severe back pain." [Tr. 870.] On physical examination, her abdomen was soft and non-tender, and she had normal bowel sounds. [Tr. 869.]

At her October 2012 visit with Dr. Pasnoor, Harper reported diarrhea and constipation. In November 2012, Harper saw Dr. Stebbins, who noted Harper's complaint of "5/7 days loose stools. 1-2 times day but urgency. At times incontinent. Varies daily." [Tr. 936.] Harper was instructed to try Metamucil daily and was given samples of a probiotic. At a December 2012, follow up visit with Steven Bormann, M.D., Mid-America Cardiology, Harper reported abdominal pain and nausea. Dr. Bormann's exam notes, under "Gastrointestinal," indicated "soft, non-tender, no masses, bowel sounds normal." [Tr. 952.]

### C. Treating physician's opinion

Dr. Stebbins filled out a two-page "Medical Source Statement—Physical" in April 2012, regarding Harper's ability to work. [Tr. 648-49.] The doctor checked boxes on the form and made five notations. With regard to physical strength, the doctor indicated that in an 8-hour work day, Harper was limited to lifting 5 pounds frequently and 10 pounds occasionally, standing or walking no more than 15 minutes at a time, standing or walking no more than 4 hours in total (with frequent changes in position), sitting no more than 1 hour at a time, sitting no more than 4 hours in total, and limited pushing and pulling due to sensation impaired by neuropathy, and pain and weakness due to mastectomy. The doctor opined that because Harper was blind in the left eye, Harper was limited to occasional visual tasks requiring near acuity, far acuity, or depth perception. The doctor opined that Harper would need to lie down or recline 20-30 minutes, twice a day, to alleviate pain symptoms, and that her pain medication "on average 2 times a day causes fatigue and impaired concentration." [Tr. 649.]

### D. Harper's testimony; third-party reports

Harper's hearing was held in January 2013. She testified that her vision problems began in 2002. She said she cannot see out of the left eye and that the blurriness in her right eye has increased since 2002. She testified that by 2005, her vision problems had increased to the point where she was unable to do things. She cannot look toward the sun and wears sunglasses to take out the trash. She stumbles "constantly, up and down stairs" in her home and has "broken four toes, two of them twice in the last four years." [Tr. 44.] She has difficulty driving and reading. When she looks out of both eyes, she has double vision, and she covers her left eye to see to fill out paperwork.

Harper testified that her neuropathy also prevents her from working. It caused her to "switch[] from one job to another." [Tr. 45.] She said she cannot feel heat, cold, or the sensation of touch, and has a hard time grasping onto and holding things. She testified, "I drop things all the time. And my fear was, also was dropping babies." [*Id.*] She also has pain with her neuropathy. She explained, "Both legs, it's a pin-like burning sensation. If I move around, it intensifies. And then my outside of my legs feel like somebody has hit them with a baseball bat constantly." [*Id.*] When asked what activities made her leg pain worse, Harper testified, "Just walking up and down the stairs. Just any movement." [Tr. 46.] When her counsel then asked whether she had any "pain while…sitting there" (at the hearing), Harper answered, "Because of my back and my neck area from two car accidents." [*Id.*] On a pain scale of zero to ten—zero as having no pain, and ten as having pain that requires going to an emergency room—Harper rated her average daily leg pain at "five" and, after taking pain medication, her average daily

9

neck pain at "six or seven" and back pain at "seven." [Tr. 46-47.] She testified that she can comfortably sit no longer than 15 minutes and stand no longer than ten or 15 minutes before needing to sit, and cannot walk more than a block before having to stop. [Tr. 47-48.] She can lift "five pounds maybe." [Tr. 48.]

Harper also attributed left arm weakness to her cancer surgery. She testified, "[Surgeons] took a lot of muscle tissue…because I had four areas. So I'm really weakened on that, and then plus the neuropathy, when they did the test I'm losing my muscle and nerve, nerve damage." [Tr. 48.] She does not do as much with her left hand and cannot stretch up to reach things from a top shelf.

Harper testified that her diabetes is controlled, with diet. [Tr. 50.]

As for complaints of diarrhea, Harper said she can have it "morning, noon or night," and cannot predict when. [Tr. 50.] She "can't leave the house very often" because of it. [Id.] She can have episodes "five or, five to seven different times a day, and then each time [she] might be in the restroom ten minutes or 45 minutes." [Id.] She testified that the problem started "four-plus years ago…[and] intensified quadruple when [she] started the cancer medicine" in 2011. [Tr. 51.]

With respect to mental issues that prevent her from working, Harper testified, "I have constant depression. I've fought that…since the early 1980s when I was hospitalized. And I've been on depression medicine off and on through those years, but constantly for the last three to four years." [Tr. 52.] The medications help "[a]bout 50 percent." [Id.] She said she has about two bad days a week due to depression and will just watch television, but she has problems with short-term memory and cannot

10

remember what she has just seen.

Harper testified that her husband helps with household chores and she cannot do all of them. She also testified, "He takes me out on the weekends, and we don't eat out as much as we used to, so we bring a lot of leftovers back to where we have enough for the whole week." [Tr. 54.] She can take a shower, wash her hair, pick up around the house, and do some dusting. She said she wears clothes without buttons or zippers because she does not have sensation in her hands to feel buttons to fasten them, or pull up a zipper. [*Id.*]

Harper's sister, Becky Lynch, submitted a third-party statement prepared in July 2011. Lynch noted that Harper was experiencing dry heaves from the cancer medication she had recently started taking; keeps house, cooks, cleans, drives and shops; needs to be careful about how much she lifts; has trouble reading with one eye; and has had some problems, for many years, with stairs due to leg numbness.

Harper's husband, Dennis, submitted a letter prepared in August 2011. He stated that Harper had been blind in the left eye since July 2004; has problems with depth perception; does not drive at night except for short trips; can no longer participate in home improvement projects because she cannot hold and grasp things; and was having side effects from her cancer medication.

### E. The consulting and vocational experts' opinions, and the ALJ's decision

Harper was examined by two psychological consultants at the request of the State agency. She saw Karen Jordan, Ph.D., in June 2011. [Tr. 557-560.] Dr. Jordan's summary and diagnostic impression included major depressive disorder, recurrent, mild

Case 4:14-cv-00658-NKL   Document 10   Filed 02/24/15   Page 11 of 22

without psychotic features. She opined that Harper could understand and follow directions, had average cognitive ability, had average ability to attend and concentrate, had low-average short-term memory, and could manage funds.

Harper saw Joi McNeely-Phelps, Ph.D., in December 2011. Harper reported a history of depression. She said she had not been able to work since March 2011, but had had the same disability since 2004. The day of the exam, Harper was upset because she had been told she had a mass on her liver and it would have to be evaluated further. She reported vomiting as often as 20 times a day and having diarrhea 7 times a day since the beginning of 2011. She said she and her husband attend church every Sunday and go for "a nice lunch" after church; have a "date night" on Saturday; and once a week go to see a movie. [Tr. 644.] She also reported that she keeps some of her five grandchildren one or two weekends a month; visits her 84-year-old father once a week; and enjoys going to the mall to walk and to watch people. Her sister takes her to thrift stores once a month to buy clothes. She reported that she is able to drive and that she had driven herself to the consultation. Dr. McNeely-Phelps' diagnostic impression included major depressive disorder, recurrent, moderate. The doctor noted that Harper presented as anxious and was focused on health concerns, and had a history of depression. Harper did not exhibit any impairments in cognitive functioning. Dr. McNeely-Phelps opined that Harper should be capable of performing a variety of job-related tasks, has appropriate social skills, is capable of interacting with others in the workplace, and appears capable of managing her own funds responsibly.

Three non-examining consultants, two psychiatric and one medical, also reviewed

Harpers' records and prepared review technique forms. None opined that Harper had limitations that preclude her ability to work. [Tr. 69, 83, 85-86.]

The ALJ found Harper has severe impairments, the "most significant of which are" visual difficulties related to (1) left eye blindness secondary to complication of a 2003 laser surgery procedure, and (2) bilateral retinopathy secondary to type 2 diabetes; and status post left mastectomy for breast cancer as of March 31, 2011, without recurrence. [Tr. 14.] The ALJ concluded Harper's impairments did not meet or equal listings for vision[1], breast cancer, type 2 diabetes, or peripheral neuropathy (including carpal tunnel syndrome).

The ALJ found a "loose nexus" between Harper's impairments and subjective allegations. [Tr. 22.] But after examining the credibility factors and record, the ALJ concluded Harper's "testimony about her symptoms was very exaggerated and is no more credible than what is directly supported by the well-documented record of her complaints in treatment, and the medical observations." [Tr. 23.]

The ALJ gave Dr. Stebbins' opinion no weight, on the basis that it was not supported by objective testing, contains no explanation of how the limitations were derived, is not consistent with the record as a whole, and contains no supporting facts. [Tr. 25-26.] The ALJ additionally noted that Dr. Stebbins is not a specialist in the assessment of physical capacity and was "apparently motivated by a nonmedical goal[.]" [Tr. 25-26.]

---

[1] The ALJ reviewed three visual listings: 2.02 (loss of visual acuity), 2.03 (contraction of visual field of better eye), and 2.04 (loss of visual efficiency). In deciding Harper did not meet any of the listings, the ALJ explained that all three depend on the status of the "better eye," in this case, Harper's right eye. [Tr. 17.]

13

The ALJ gave significant weight to the two State agency psychological consultants' opinions, explaining that they were consistent with the medical evidence, which establishes no severe mental impairments. [Tr. 26.]

The ALJ concluded Harper has the residual functional capacity (RFC) to perform light work as defined in 20 CFR 404.1567(b), allowing for, in an 8-hour work day:

> pushing, pulling, lifting, and carrying 20 pounds occasionally and 10 pounds frequently; standing and walking up to a total of 6 hours, with normal breaks; sitting 6 to 8 hours; no work at unprotected heights or around hazards, and no climbing ladders, ropes, or scaffolds, but otherwise able to occasionally perform work-related postural activities (i.e., balancing, stooping, kneeling, crouching, crawling, and climbing ramp/stairs); no above shoulder work on the nondominant left side; no power grasping or squeezing bilaterally, such as with pliers, wrenches, and tools; no vibration; no work requiring very fine visual acuity; no peripheral vision on the left; and no depth perception.

[Tr. 21-22.]

Based on vocational expert testimony, the ALJ determined Harper is capable of performing her past relevant work as an administrative clerk, noting that such work "does not require the performance of work-related activities precluded by" Harper's RFC. [Tr. 26.] In making that determination, the ALJ specifically examined the vision requirements related to the job classification of administrative clerk, and concluded Harper was capable of performing the job "as it is generally performed." [Tr. 28.]

The ALJ concluded Harper was not disabled.

## II. Discussion

Harper argues that the ALJ should have given controlling weight to the opinion of her treating physician, Dr. Stebbins, and that the RFC and credibility determination are not based on substantial evidence. She asks for reversal and remand for further proceedings.

The Commissioner's findings are reversed "only if they are not supported by substantial evidence or result from an error of law." *Byers v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable mind might accept it as adequate to support the Commissioner's conclusions. *See Juszczyk v. Astrue,* 542 F.3d 626, 631 (8th Cir. 2008). "If substantial evidence supports the Commissioner's conclusions, [the Court] does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Byers*, 687 at 915.

### A. Credibility determination

When an ALJ determines that a claimant is not credible and decides to reject the claimant's statement, the ALJ must provide specific reasons for the credibility finding. *See Delrosa v. Sullivan*, 922 F.2d 480, 485 (8th Cir. 1991); *Prince v. Bowen*, 894 F.2d 283, 296 (8th Cir. 1990). The ALJ must specifically consider evidence related to the claimant's work record; daily activities; "the duration, frequency and intensity of pain; the precipitating and aggravating factors; the dosage and side effects of medication; and functional restrictions." *Delrosa*, 922 F.2d at 485 (citing *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984)). An ALJ may discount a claimant's subjective

15

reports of pain only if there are inconsistencies in the record as a whole. *Johnson v. Chater,* 87 F.3d 1015, 1017 (8th Cir. 1996).

Credibility is "primarily for the ALJ to decide, not the courts." *Moore v. Astrue,* 572 F.3d 520, 524 (8th Cir. 2009) (internal quotation and citation omitted). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the reviewing court] will normally defer to the ALJ's credibility determination." *Halverson v. Astrue,* 600 F.3d 922, 931 (8th Cir. 2010) (internal quotation and citation omitted).

Here, the ALJ specifically considered the *Polaski* factors. The ALJ noted Harper was engaged in substantial gainful activity when she filed her disability application on February 7, 2011. Additionally, in her application, she alleged she became disabled in 2004, but had engaged in substantial gainful activity every year since 2004. In fact, Harper was working as much as 50 to 55 hours a week as a nanny-house manager from November 2006 until July 2010. Work performed during any period in which a claimant alleges she was under a disability may demonstrate an ability to perform substantial gainful activity. 20 C.F.R. §§ 404.1571, 416.971; *Naber v. Shalala*, 22 F.3d 186, 188-89 (8th Cir. 1994); *Beasley v. Califano*, 608 F.2d 1162, 1166 (8th Cir. 1979).

Additionally, although Harper alleged disability due to vision problems beginning in 2003, the ALJ noted Harper had worked from 2003 to 2011 with the alleged problems. She last worked in March 2011 as a nanny. Harper also claimed disability due to diabetes-related neuropathy. In February 2011, Harper reported a ten-year history of neuropathy to Dr. Stebbins, a time frame that would include Harper's performance of substantial gainful activity, such as working up to 55 hours a week as a nanny for three

children, and later, for 25 hours a week as a nanny for two small children. When an individual has worked with an impairment over a period of years, absent significant deterioration, it cannot be considered disabling at present. *Orrick v. Sullivan*, 966 F.2d 368, 370 (8th Cir. 1992); *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992); *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir. 1990).

The ALJ further noted that Harper's allegations of severe pain and significantly limited activities are not supported by the medical record. Harper reported that any movement intensified her leg pain, such that the outside of her legs would feel like they had been "hit…with a baseball bat constantly," [Tr. 45], and that she could only sit 15 minutes and stand ten to 15 minutes. But treatment notes do not reflect such severe and significant complaints. To the contrary, on August 13, 2012, and October 29, 2012, Harper's pain rating was zero and her ECOG status was "0, fully active, able to carry on all pre-disease performance without restriction," [Tr. 23, 852, 941], for example. *Compare Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) ("Subjective complaints may be discounted if the evidence as a whole is inconsistent with the claimant's testimony."). Harper also complained of weakness because doctors removed a lot of muscle during her mastectomy, but that is not documented in the record.

The ALJ further noted that Harper's cancer medications could, understandably, have side-effects including gastrointestinal distress, and noted her complaints of the most severe symptoms related to when she took certain medications, and improved when she went off the medications. As for duration of symptoms, while treatment records from October and November 2012 noted GI issues, the ALJ noted that treatment records in

April, May and December 2012 did not mention any.

Harper's own testimony at the hearing about her activities and her reports of her activities to Dr. McNeely Phelps also undercuts her claims of disability. She testified that any movement causes her legs to feel like they were hit with a baseball bat, and rated her average daily leg pain at a level of 5. But she also testified that with medication, her average daily neck and back pain—caused by her two accidents in 2010 for which she received some chiropractic treatment—was rated higher, at levels 6 and 7. She testified that she can rarely leave the house because of diarrhea that can happen at any time without warning, five to seven times a day. But she also testified that her husband takes her out on the weekends.

In addition, Harper reported to Dr. McNeely-Phelps, the examining psychologist, that she vomited as often as 20 times a days, and had diarrhea seven times a day since the beginning of 2011, which is not reflected in treatment records. Also inconsistent with her claim of disability, she told the doctor that she keeps some of her grandchildren one or two weekends a month; goes to church and out for lunch with her husband every Sunday; has date night with her husband on Saturdays; goes out to see a movie once a week; visits her 84-year old father once a week; and is able to drive.

The ALJ articulated the inconsistencies upon which he relied in discrediting Harper's testimony about her subjective complaints, and substantial evidence in the record as a whole supports the ALJ's credibility finding. Accordingly, this Court will not disturb the finding.

### B. Weight given Dr. Stebbins' medical opinion

All medical opinion evidence, regardless of source, is weighed by examining the length of the treatment relationship and frequency of examination, nature and extent of the treatment relationship, supportability of the opinion including medical signs and laboratory findings, consistency with the record as a whole, specialization of the medical source, and other factors such as the source's understanding of the disability programs. 20 C.F.R. § 404.1527; 20 C.F.R. § 404.927.

If a treating physician's opinion concerning the nature and severity of a claimant's impairment "is well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with the other substantial evidence in [the] case record," it is given "controlling weight." 20 C.F.R. § 404.1527. But an "ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (internal quotation omitted). *See also Blackburn v. Colvin,* 761 F.3d 853, 860 (8th Cir. 201) (same).

As noted above, the ALJ gave Dr. Stebbins' opinion no weight, on the basis that it was not supported by objective testing, contains no explanation of how the limitations were derived, is not consistent with the record as a whole, and contains no supporting facts. The ALJ also noted that Dr. Stebbins is not a specialist in the assessment of physical capacity and was "apparently motivated by [the] nonmedical goal" of helping Harper qualify for benefits. [Tr. 25-26.]

The ALJ acknowledged that Dr. Stebbins was Harper's treating physician throughout the years relevant to the disability claim. [Tr. 25.] But Dr. Stebbins' opinion of April 2012 describes extreme limitations—including lifting 5 pounds frequently and 10 pounds occasionally, standing or walking no more than 15 minutes at a time, standing or walking no more than 4 hours in total (with frequent changes in position), sitting no more than 1 hour at a time, and sitting no more than 4 hours in total. The doctor also opined that Harper would need to lie down or recline 20-30 minutes, twice a day, to alleviate pain symptoms, and that her pain medication causes fatigue and impaired concentration twice a day, on average.

However, in March 2012, Harper's cardiologist examined Harper and found, among other things, that Harper had normal strength in her arms and legs, was neurologically grossly intact, and was doing well. At oncology follow ups throughout 2011 and 2012, Harper's doctors repeatedly noted pain rating reports of zero, and assigned an ECOG status of fully active, able to carry on all pre-disease performance without restriction. Dr. Toby, the surgeon who performed Harper's left-hand carpal tunnel release in the summer of 2012, noted Harper's own report that the surgery had completely resolved her symptoms. In October 2012, Dr. Pasnoor, the neurologist who diagnosed painful diabetic peripheral neuropathy and bilateral meralgia parasthetica, noted that Harper's pain was stable on pain medication and prescribed exercise as Harper's treatment, not rest. In 2010, x-rays and a CT scan taken after Harper fell out of a truck showed no abnormalities, nor did a 2013 x-ray of her neck. Consistent with this evidence, two psychological consultants evaluated Harper in 2011, and neither found

Case 4:14-cv-00658-NKL   Document 10   Filed 02/24/15   Page 20 of 22

evidence of cognitive impairment. Both concluded Harper could function effectively in the workplace, and both found she was capable of managing her own funds.

As for other factors related to weighing the medical opinion, the record does not show that Dr. Stebbins is a specialist in assessment of physical capacity, or that Dr. Stebbins has any specialized understanding of the disability program. Further, Harper's prior work experience is inconsistent with Dr. Stebbins' limitations.

The Court will not disturb the ALJ's decision to give Dr. Stebbins' opinion no weight.

### C.  Support for the RFC

Harper also argues that the RFC is not based on substantial evidence. Residual functional capacity is what a claimant can still do despite her limitations. 20 C.F.R. § 404.1545(a). It is an assessment based upon all of the relevant evidence including a claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records. 20 C.F.R. § 404.1545(a). Put another way, the RFC must be upon all of the substantial evidence, and must be supported by at least some medical evidence. *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000). Here, the decision reflects that the ALJ considered the entirety of the record. The RFC is also based on medical evidence, including medical records from Harper's treating physicians.

Specifically, the ALJ found Harper retained the RFC to push, pull, lift, and carry 20 pounds occasionally and ten pounds frequently; stand and walk up to six hours a day; and sit for six to eight hours a day. These findings are supported by notations in the medical record that Harper was fully active and able to carry on all pre-disease

performance without restriction; was doing well; and should be exercising.

The ALJ found Harper should not work at unprotected heights or around hazards and should not climb ladders, ropes, or scaffolds. This finding is consistent with medical records documenting Harper's vision impairments and Harper's description of those impairments.

The ALJ found Harper could occasionally balance, stoop, kneel, crouch, crawl, and climb stairs or ramps; and could not perform any work above shoulder level on the left side. These findings are consistent with Harper's testimony that she had pain in her left shoulder following her breast cancer surgery.

The ALJ found Harper could not perform power grasping or squeezing with either hand, or work around vibration. These findings are consistent with testing and Harper's diagnosis of neuropathy.

The ALJ found Harper could not perform work requiring very fine visual acuity, peripheral vision on the left, or depth perception. This finding is consistent with Harper's documented vision problems.

The ALJ's RFC determination is supported by substantial evidence, including medical evidence.

**III.    Conclusion**

The Commissioner's decision is affirmed.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated:   February 24, 2015
Jefferson City, Missouri